ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

2003 FEB 14  PM 12: 02

CLERK OF COURT

| | |
|---|---|
| STANLEY H. SHAWL, Individually And On Behalf of All Others Similarly Situated, | No. |
| Plaintiffs, | CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATIONS OF FEDERAL SECURITIES LAWS |
| v. | |
| CLIFTON H. MORRIS, JR., DANIEL E. BERCE, MICHAEL R. BARRINGTON and AMERICREDIT CORP., | **4-03CV_115-A** |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff, by his attorneys, for his Class Action Complaint, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief based upon the investigation of plaintiff's attorneys as to all other matters. The investigation includes the thorough review and analysis of public statements, publicly filed documents of AmeriCredit Corp. ("AmeriCredit" or the "Company"), press releases, news articles and the review and analysis of accounting rules and related literature. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a securities class action on behalf of public investors who purchased the common stock of AmeriCredit during the period from April 14, 1999 to January 15, 2003 inclusive (the "Class Period").

2.      AmeriCredit is a Texas corporation headquartered in Fort Worth, Texas. AmeriCredit engages in the indirect automobile finance business. AmeriCredit buys consumer finance loans from automobile dealers, then conveys such loans to special purpose trusts which

issue bonds that are secured by the loans in the trusts. Cash flow from the loans is retained in the trusts in restricted accounts – as reserves against loan defaults and unavailable to AmeriCredit – until the reserves reach a certain amount.

3.      Embedded in the bonds are trigger mechanisms to protect bondholders. One such trigger, which is activated when delinquent loans rise above certain levels, requires that cash reserves that would otherwise flow to AmeriCredit must be retained in the trusts to provide the bond investors with a protective cushion against loan-customer defaults. Many of Americredit's loan customers are "subprime" borrowers who have either poor credit histories or difficulty obtaining credit and thus are at greater risk for delinquency or default. If the number of delinquent loans increases, AmeriCredit would need larger cash reserves to maintain the protective cushion.

4.      Throughout the Class Period, defendants misrepresented AmeriCredit's financial performance by improperly deferring delinquent loans to avoid customer defaults. The loan extensions had the effect of limiting delinquencies, thus allowing defendants to access the cash flow from the restricted accounts and maintain inadequate cash reserves, yet still avoid activation of the delinquency triggers.

5.      AmeriCredit's problems with the delinquency triggers were revealed on September 17, 2002, when an analyst report published by Credit Suisse First Boston ("CSFB") downgraded AmeriCredit stock from "Outperform" to "Neutral." The CSFB report and other analysts noted that the Company's financial restructuring plan – released the previous day after the close of trading – included raising approximately $500 million in capital, changing the Company's method for reporting earnings, and "renegotiating its delinquency triggers on its

existing deals."

6. Approximately four months later, one day after the end of the Class Period, AmeriCredit's stock fell a shocking 54% in one day – the same day on which the Company reported second quarter fiscal 2003 financial results which were negatively affected by rising loan defaults.

7. This case involves defendants' material omissions and the dissemination of materially false and misleading statements concerning loan delinquencies at AmeriCredit. These misleading statements and omissions drove AmeriCredit's stock price to a Class Period high of $63.63 on August 8, 2001, during which time the Company's financial performance was artificially inflated by improperly deferring loan delinquencies, to $3.70 per share on January 16, 2003 – one day after the end of the Class Period – when the Company reported

8. Defendants' manipulation of AmeriCredit's loan delinquency rate during the Class Period gave the Company access to much-needed cash – money that normally would have been retained in the trusts as a cushion against delinquent loans – which artificially inflated the Company's earnings and stock price and acted as a fraud on the market, while the Class has been damaged thereby.

## JURISDICTION AND VENUE

9. The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act"). Jurisdiction is conferred by §27 of the 1934 Act. Venue is proper pursuant to §27 of the 1934 Act as the corporate headquarters of defendant AmeriCredit are located in this district and many of the acts complained of occurred in this district.

3

## THE PARTIES

10.     Plaintiff Stanley H. Shawl purchased AmeriCredit publicly traded securities as detailed in the attached Certification and was damaged thereby.

11.     AmeriCredit is a Texas corporation with its principal headquarters located in Fort Worth, Texas. AmeriCredit common stock is, and at all relevant times has been, held and publicly traded on the open market. Its common stock is listed on the New York Stock Exchange ("NYSE"). As of October 31, 2002, more than 152 million shares of AmeriCredit common stock were issued and outstanding. The market for AmeriCredit common stock is efficient and quickly reflects all publicly available information.

12.     Defendant Clifton H. Morris, Jr. has been the Chairman of the Board of Directors of AmeriCredit since 1988, and was Chief Executive Officer of AmeriCredit from November 1996 until July 2000.

13.     Defendant Daniel E. Berce has been Vice Chairman and Chief Financial Officer of AmeriCredit since November 1996 and a Director of AmeriCredit since 1990.

14.     Defendant Michael R. Barrington has been Vice Chairman, President, and Chief Operating Officer of AmeriCredit since November 1996, Chief Executive Officer since July 2000, and a Director of AmeriCredit since 1990.

15.     Defendants Morris, Berce, and Barrington are referred to collectively herein as the "Individual Defendants."

16.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via

4

access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

17.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of AmeriCredit, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

18.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the

5

Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.  The Individual Defendants participated in the drafting, preparation  and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with AmeriCredit, each of the Individual Defendants had access to the adverse undisclosed information about AmeriCredit's business operations and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about AmeriCredit and its business, issued or adopted by the Company materially false and misleading.

20.  The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the

6

Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

21.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of AmeriCredit common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding AmeriCredit's business, operations, management and the intrinsic value of AmeriCredit common stock and caused plaintiff and other members of the Class to purchase AmeriCredit securities at artificially inflated prices. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     Each of the Individual Defendants and AmeriCredit are liable in that they inflated the price of AmeriCredit stock by making false and misleading statements and omitting material adverse information. The defendants' wrongful course of business(I) artificially inflated the price of AmeriCredit's stock during the Class Period; (ii) deceived the investing public, including plaintiff and other Class members, into acquiring AmeriCredit's securities at artificially inflated prices; and (iii) permitted AmeriCredit to grow and benefit economically from the wrongful

7

course of conduct.

## SUBSTANTIVE ALLEGATIONS

23.     AmeriCredit, through its subsidiaries, engages in the indirect automobile finance

business.  It buys consumer finance loans from automobile dealers, then conveys such loans to a

special purpose trusts which issue asset-backed securities that are secured by the loans in the

trusts.

**Defendants' Misleading Statements During The Class Period**

24.     On April 14, 1999, the first day of the Class Period, AmeriCredit disseminated a

press release titled "AmeriCredit Corp. Announces Record Third Quarter Operating Results And

Expansion Of Credit Facilities."  The press release, touting "record third quarter operating

results" states in part:

> **AmeriCredit Corp. Announces Record Third Quarter Operating Results
> And Expansion Of Credit Facilities**
>
> FORT WORTH, Texas--April 14, 1999--Americredit Corp. (NYSE:ACF)
> today announced record net income of $19,505,000, or $0.29 per share, for its
> third fiscal quarter ended March 31, 1999, versus earnings of $13,258,000, or
> $0.20 per share, for the quarter ended March 31, 1998. On a comparative basis,
> net income increased 47% and earnings per share rose 45%.
>
> For the nine months ended March 31, 1999, AmeriCredit reported record net
> income of $52,363,000, or $0.78 per share, versus earnings of $35,400,000, or
> $0.55 per share, for the nine months ended March 31, 1998, representing an
> increase of 48% in net income and an increase of 42% in earnings per share.
>
> Automobile loan purchases were $766,778,000 for the third quarter of fiscal 1999,
> an increase of 60% over loan purchases of $480,482,000 for the third quarter of
> fiscal 1998. For the nine months ended March 31, 1999, automobile loan
> purchases were $1,990,893,000, 69% higher than loan purchases of
> $1,176,734,000 for the nine months ended March 31, 1998.
>
> AmeriCredit's managed auto receivables totaled $3,553,208,000 at March 31,

8

1999, an increase of 85% since March 31, 1998. The Company opened 3 branch locations in its third fiscal quarter bringing the total number of branch locations to 168 in 41 states and Canada at March 31, 1999.

Managed auto receivables more than sixty days delinquent were 2.3% of total managed auto receivables at March 31, 1999, down from 2.6% at March 31, 1998.

Annualized net charge-offs decreased to 4.7% of average managed auto receivables for the third quarter ended March 31, 1999, from 5.3% for the third quarter of fiscal 1998.

AmeriCredit also announced that it has entered into a new $150 million structured warehouse facility with Credit Suisse First Boston as agent. This facility matures in March 2000. In addition, AmeriCredit completed a $115 million credit agreement with a group of banks led by Wells Fargo Bank, replacing the Company's $235 million bank line of credit. This facility also matures in March 2000. With the closing of these two financing agreements, AmeriCredit has increased its warehouse capacity to a total of $770 million. The credit facilities are used to finance the purchase of automobile receivables prior to securitization.

25.     On May 14, 1999, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended March 31, 1999. It was signed by defendant Berce. In the Form 10-Q, AmeriCredit repeated the financial results reported in the April 14, 1999 press release. The 10-Q states that the financial statements contained therein "include all adjustments . . . necessary for a fair presentation of the results of such interim periods." This statement was included in all Form 10-Qs discussed herein. The May 14, 1999, 10-Q also reported that delinquent contracts – *i.e.*, automobile receivables more than 30 days delinquent – as a percentage of average managed auto receivables, were 2.3% for the quarter.

26.     Defendants knew or recklessly disregarded that the description of the Company's financial performance in the April 14, 1999, press release and the May 14, 1999, Form 10-Q was false and misleading because they fail to disclose that the results were partially the result of defendants improperly deferring loan delinquencies.

9

27.   On August 4, 1999, AmeriCredit disseminated a press release titled "AmeriCredit

Corp. Announces Its 21st Consecutive Quarterly Earnings Increase And Record Fiscal Year End

Operating Results." The press release states in pertinent part:

**AmeriCredit Corp. Announces Its 21st Consecutive Quarterly Earnings Increase And Record Fiscal Year End Operating Results**

FORT WORTH, Texas--(BUSINESS WIRE)--Aug. 4, 1999--AmeriCredit Corp. (NYSE:ACF) today announced record net income of $22,477,000, or $0.33 per share, for its fourth fiscal quarter ended June 30, 1999, versus earnings of $13,901,000, or $0.21 per share, for the quarter ended June 30, 1998. On a comparative basis, net income increased 62% and earnings per share rose 57%.

For the fiscal year ended June 30, 1999, AmeriCredit reported record net income of $74,840,000, or $1.11 per share, versus earnings of $49,301,000, or $0.76 per share, for the fiscal year ended June 30, 1998, representing an increase of 52% in net income and an increase of 46% in earnings per share.

Automobile loan purchases were $888,902,000 for the fourth quarter of fiscal 1999, an increase of 58% over loan purchases of $561,079,000 for the fourth quarter of fiscal 1998. For the fiscal year ended June 30, 1999, automobile loan purchases were $2,879,796,000, 66% higher than loan purchases of $1,737,813,000 for the fiscal year ended June 30, 1998.

AmeriCredit's managed auto receivables totaled $4,105,468,000 at June 30, 1999, an increase of 78% since June 30, 1998. The Company opened 8 branch locations in its fourth fiscal quarter bringing the total number of branch locations to 176 in 41 states and Canada at June 30, 1999.

Annualized net charge-offs decreased to 4.5% of average managed auto receivables for the fourth quarter ended June 30, 1999, from 5.1% for the fourth quarter of fiscal 1998. Net charge-offs for the fiscal year ended June 30, 1999 were 4.7%, down from 5.3% for the fiscal year ended June 30, 1998.

Managed auto receivables more than sixty days delinquent were 1.8% of total managed auto receivables at June 30, 1999, down from 2.6% at June 30, 1998.

28.   In fact, defendants knew or recklessly disregarded that the August 4, 1999, press

release was false and misleading because it fails to disclose that the results reported were

10

partially achieved by defendants improperly deferring customer loan delinquencies.

29.     On September 28, 1999, AmeriCredit filed with the SEC its Form 10-K for

the fiscal year ended June 30, 1999.  It was signed by defendants Morris, Berce and Barrington

In the Form 10-K, AmeriCredit repeated the financial results reported in the August 4, 1999 press

release.  The 10-K states, in part, that:

> Payment deferrals are at times offered to customers who have encountered
> temporary financial difficulty, hindering their ability to pay as contracted, and
> when other methods of assisting the customer in meeting the contract terms and
> conditions have been exhausted. A deferral allows the customer to move a
> delinquent payment to the end of the loan by paying a fee (approximately the
> interest portion of the payment deferred). The collector reviews the customer's
> past payment history and statistically based behavioral score and assesses the
> customer's desire and capacity to make future payments. Before agreeing to a
> deferral, the collector must also ensure that the deferment transaction complies
> with the Company's policies and guidelines.

30.     Defendants knew or recklessly disregarded that the September 28, 1999, Form

10-K was false and misleading because it fails to disclose that the Company was improperly

deferring loan delinquencies to limit customer defaults and thus avoid activation of the

delinquency triggers.

31.     On October 13, 1999, AmeriCredit announced the Company's fiscal first-quarter

1999 results in a publicly disseminated press release which states in part:

**AmeriCredit Corp. Announces Record First Quarter Operating Results And
Its 22nd Consecutive Quarterly Earnings Increase**

FORT WORTH, Texas--(BUSINESS WIRE)--Oct. 13, 1999--AmeriCredit Corp.
(NYSE:ACF) today announced record net income of $25,324,000, or $0.35 per
share, for its first fiscal quarter ended September 30, 1999, versus earnings of
$15,482,000, or $0.23 per share, for the quarter ended September 30, 1998. On a
comparative basis, net income increased 64% and earnings per share rose 52%.

Automobile loan purchases were $1,031,837,000 for the first quarter of fiscal

11

2000, an increase of 65% over loan purchases of $624,967,000 for the first quarter of fiscal 1999. AmeriCredit's managed auto receivables totaled $4,749,085,000 at September 30, 1999, an increase of 75% since September 30, 1998. The Company opened 4 branch locations in its first fiscal quarter bringing the total number of branch locations to 180 in 41 states and Canada at September 30, 1999.

Annualized net charge-offs decreased to 4.3% of average managed auto receivables for the first quarter ended September 30, 1999, down from 4.9% for the first quarter of fiscal 1999.

Managed auto receivables more than sixty days delinquent were 2.3% of total managed auto receivables at September 30, 1999, down from 2.8% at September 30, 1998.

Clifton H. Morris, Jr., Chairman and Chief Executive Officer of AmeriCredit, said the record quarterly performance was attributable to "continuing improvement in managing credit risk and strong loan growth, resulting in a decline in loan defaults and our first quarter of auto loan purchases in excess of $1 billion."

32.     On November 5, 1999, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended September 30, 1999. The Form 10-Q was signed by defendant Berce. In it, AmeriCredit repeated the financial results reported in the October 13, 1999 press release. The November 5, 1999, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.3% for the quarter.

33.     Defendants knew or recklessly disregarded that the results described in the October 13, 1999, press release and the November 5, 1999, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

34.     On January 13, 2000, AmeriCredit issued a press release titled, "AmeriCredit Corp. Announces Second Quarter Operating Results." The press release includes a statement by defendant Morris and states in pertinent part:

12

**AmeriCredit Corp. Announces Second Quarter Operating Results**

FORT WORTH, Texas--(BUSINESS WIRE)--Jan. 13, 2000--AMERICREDIT CORP. (NYSE:ACF) today announced net income of $19,609,000, or $0.25 per share, for its second fiscal quarter ended December 31, 1999.

Earnings for the quarter include a one-time, non-recurring charge of $10,500,000 ($8,985,000, or $0.11 per share net of income tax benefits), for the closing of AmeriCredit's mortgage business. Excluding this charge, earnings for the second fiscal quarter were $28,594,000, or $0.36 per share, versus earnings of $17,376,000, or $0.26 per share, for the quarter ended December 31, 1998. On a comparative basis, excluding the charge, earnings increased 65% and earnings per share rose 38%.

For the six months ended December 31, 1999, AmeriCredit reported net income of $44,933,000, or $0.60 per share, which includes the charge for the closing of AmeriCredit's mortgage business. Excluding this charge, earnings for the six months ended December 31, 1999, were $53,918,000, or $0.72 per share, versus earnings of $32,858,000, or $0.49 per share, for the six months ended December 31, 1998. On a comparative basis, excluding the charge, this represents an increase of 64% in earnings and an increase of 47% in earnings per share.

Automobile loan purchases were $980,882,000 for the second quarter of fiscal 2000, an increase of 64% over loan purchases of $599,149,000 for the second quarter of fiscal 1999. AmeriCredit's managed auto receivables totaled $5,302,362,000 at December 31, 1999, an increase of 72% since December 31, 1998. The Company had 184 branch locations in 41 states and Canada at December 31, 1999.

Annualized net charge-offs decreased to 4.1% of average managed auto receivables for the second quarter ended December 31, 1999, down from 4.8% for the second quarter of fiscal 1999.

Managed auto receivables more than sixty days delinquent were 2.5% of total managed auto receivables at December 31, 1999, down from 2.8% at December 31, 1998.

Clifton H. Morris, Jr., Chairman and Chief Executive Officer of AmeriCredit, stated, "After significant investments in risk management tools and techniques, AmeriCredit is experiencing strong asset quality trends. At the same time, we have been able to grow the portfolio by geographic expansion and continued double digit volume increases in mature markets."

13

35.     On February 14, 2000, AmeriCredit filed with the SEC its Form 10-Q for the

quarter ended December 31, 1999. The Form 10-Q was signed by defendant Berce.  In it,

AmeriCredit repeated the financial results reported in the January 13, 2000,  press release. The

February 14, 2000, Form 10-Q also reported that delinquent contracts as a percentage of average

managed auto receivables were 2.5% for the quarter.

36.     In fact, defendants knew or recklessly disregarded that the results reported in the

January 13, 2000 press release and the February 14, 2000, 10-Q  were false and misleading

because the Company's financial performance was artificially inflated by improperly deferring

loan delinquencies.

37.     On April 13, 2000, defendants disseminated a press release titled "AmeriCredit

Corp. Reports 66% Increase in Third Quarter Earnings On Record Loan Volume of $1.2 Billion."

The press release includes a statement by defendant Morris and states in pertinent part:

> **AmeriCredit Corp. Reports 66% Increase in Third Quarter Earnings On
> Record Loan Volume of $1.2 Billion**
>
> FORT WORTH, Texas--(BUSINESS WIRE)--April 13, 2000--AmeriCredit Corp.
> (NYSE:ACF) today announced record net income of $32,410,000, or $0.41 per
> share, for its third fiscal quarter ended March 31, 2000, versus earnings of
> $19,505,000, or $0.29 per share, for the quarter ended March 31, 1999. On a
> comparative basis, net income increased 66% and earnings per share rose 41%.
>
> For the nine months ended March 31, 2000, AmeriCredit reported net income of
> $77,343,000, or $1.01 per share, including a charge for the closing of
> AmeriCredit's mortgage business in the second quarter. Excluding this charge,
> earnings for the nine months ended March 31, 2000 were $86,328,000, or $1.13
> per share, versus earnings of $52,363,000, or $0.78 per share, for the nine months
> ended March 31, 1999. On a comparative basis, excluding the charge, this
> represents an increase of 65% in earnings and 45% in earnings per share.
>
> Automobile loan purchases were a record $1,155,116,000 for the third quarter of
> fiscal 2000, an increase of 51% over loan purchases of $766,778,000 for the third

14

quarter of fiscal 1999. AmeriCredit's managed auto receivables totaled $5,949,918,000 at March 31, 2000, an increase of 67% since March 31, 1999. The Company had 186 branch locations in 41 states and Canada at March 31, 2000.

Annualized net charge-offs decreased to 3.9% of average managed auto receivables for the third quarter ended March 31, 2000, down from 4.7% for the third quarter of fiscal 1999. This marks the Company's 16th consecutive quarter of stable or declining charge-off levels.

Managed auto receivables more than sixty days delinquent were 2.1% of total managed auto receivables at March 31, 2000, compared to 2.3% at March 31, 1999.

Clifton H. Morris, Jr., Chairman and Chief Executive Officer of AmeriCredit, stated, "We are extremely pleased that we achieved record loan origination volume while implementing increases in loan pricing during the quarter. Our increased return on managed assets during the quarter confirms our ability to sustain our margins during periods of rising interest rates." AmeriCredit's average interest rate on loans originated in the third quarter increased by approximately 70 basis points over the preceding quarterly period ended Dec. 31, 1999, more than offsetting higher funding costs.

38.     On May 15, 2000, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended March 31, 1999.  The Form 10-Q was signed by defendant Berce.  In the 10-Q, AmeriCredit repeated the financial results reported in the April 13, 2000, press release.  The May 15, 2000, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.1% for the quarter.

39.     In fact, defendants knew or recklessly disregarded that the results described in the April 13, 2000, press release and the May 15, 2000, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

40.     Approximately three months later, on August 3, 2000, defendants disseminated a press release titled "AmeriCredit Corp. Reports Record Fourth Quarter and Year End Operating

15

Results." The August 3, 2000, press release states in pertinent part:

### AmeriCredit Corp. Reports Record Fourth Quarter and Year End Operating Results

FORT WORTH, Texas--(BUSINESS WIRE)--August 3, 2000--AmeriCredit Corp. (NYSE:ACF)

-- 4th Quarter Earnings Per Share Up 39%, to $0.46
-- 4th Quarter Net Income Up 65%, to $37.2 Million
-- Managed Portfolio Up 62% Over June 1999
-- Annualized Charge-Off Rate Declines to 3.8%

AmeriCredit Corp. (NYSE:ACF) today announced record net income of $37,158,000, or $0.46 per share, for its fourth fiscal quarter ended June 30, 2000, versus earnings of $22,477,000, or $0.33 per share for the same period a year earlier. On a comparative basis, net income increased 65% and earnings per share rose 39%.

For the fiscal year ended June 30, 2000, AmeriCredit reported net income of $114,501,000, or $1.48 per share, including a charge for the closing of AmeriCredit's mortgage business in the second quarter. Excluding this charge, earnings for the fiscal year ended June 30, 2000 were $123,486,000, or $1.59 per share, versus earnings of $74,840,000, or $1.11 per share, for the previous fiscal year. On a comparative basis, excluding the charge, this represents an increase of 65% in earnings and 43% in earnings per share.

Automobile loan purchases were a record $1,260,110,000 for the fourth quarter of fiscal 2000, an increase of 42% over loan purchases of $888,902,000 for the fourth quarter of fiscal 1999. For the fiscal year ended June 30,2000, automobile loan purchases were $4,427,945,000, 54% higher than loan purchases of $2,879,796,000 for the fiscal year ended June 30, 1999. AmeriCredit's managed auto receivables totaled $6,649,981,000 at June 30, 2000, an increase of 62% since June 30, 1999. The Company had 196 branch locations in 41 states and Canada at June 30, 2000.

Annualized net charge-offs decreased to 3.8% of average managed auto receivables for the fourth quarter ended June 30, 2000, down from 4.5% for the fourth quarter of fiscal 1999. This marks the Company's 17th consecutive quarter of stable or declining charge-off levels. Net charge-offs for the fiscal year ended June 30, 2000 were 4.0%, down from 4.7% for the previous fiscal year.

Managed auto receivables more than sixty days delinquent were 2.3% of total

16

managed auto receivables at June 30, 2000, compared to 1.8% at June 30, 1999.

41.     On September 28, 2000, AmeriCredit filed with the SEC its Form 10-K for the

fiscal year ended June 30, 2000. The Form 10-K was signed by defendants Morris, Barrington

and Berce. In the fiscal 2000 10-K, AmeriCredit repeated the financial results reported in the

August 3, 2000, press release. The 10-K also stated, in pertinent part:

> Payment deferrals are at times offered to customers who have encountered
> temporary financial difficulty, hindering their ability to pay as contracted. A
> deferral allows the customer to move a delinquent payment to the end of the
> loan, usually by paying a fee (calculated in a manner specified by applicable
> law). The collector reviews the customer's past payment history and statistically
> based behavioral score and assesses the customer's desire and capacity to make
> future payments. Before agreeing to a deferral, the collector must also ensure that
> the deferment transaction complies with the Company's policies and guidelines.

42.     Defendants knew or recklessly disregarded that the September 28, 2000, Form

10-K was false and misleading because it fails to disclose that the Company was improperly

deferring loan delinquencies to limit customer defaults and thus avoid activation of the

delinquency triggers.

43.     On October 11, 2000, AmeriCredit issued a press release titled, "AmeriCredit

Corp. Announces Second Quarter Operating Results." The press release includes a statement by

defendant Morris and states in pertinent part:

> **AmeriCredit Corp. Reports Record First Quarter Operating Results**
>
> 1st Quarter Earnings Per Share Up 46% to $0.51
> 1st Quarter Net Income Up 67% to $42.3 Million
> Managed Portfolio Up 57% Over September 1999
> Annualized Charge-Off Rate Declines to 3.7%
>
> AMERICREDIT CORP. (NYSE:ACF) today announced record net income of
> $42,273,000, or $0.51 per share, for its first fiscal quarter ended September 30,
> 2000, versus earnings of $25,324,000, or $0.35 per share for the same period a

17

year earlier. On a comparative basis, net income increased 67% and earnings per share rose 46%.

Automobile loan purchases were a record $1,406,753,000 for the first quarter of fiscal 2001, an increase of 36% over loan purchases of $1,031,837,000 for the first quarter of fiscal 2000. AmeriCredit's managed auto receivables totaled $7,448,553,000 at September 30, 2000, an increase of 57% since September 30, 1999. The Company had 198 branch locations in 41 states and Canada at September 30, 2000.

Annualized net charge-offs decreased to 3.7% of average managed auto receivables for the first quarter ended September 30, 2000, down from 4.3% for the first quarter of fiscal 2000. This marks the Company's 18th consecutive quarter of stable or declining charge-off levels.

Managed auto receivables more than sixty days delinquent were 2.4% of total managed auto receivables at September 30, 2000, compared to 2.3% at September 30, 1999.

44.     On November 14, 2000, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended September 30, 2000.  The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the October 11, 2000, press release.  The November 14, 2000, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.4% for the quarter.

45.     In fact, defendants knew or recklessly disregarded that the results reported in the October 11, 2000, press release and the November 14, 2000, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

46.     On January 10, 2001, AmeriCredit issued a press release titled, "AmeriCredit Corp. Announces Second Quarter Operating Results." This press release states that the Company's second quarter earnings were $0.57 per share, compared with earnings of $0.25 per

18

share for the same period a year earlier. The press release includes a statement by defendant

Morris and states in pertinent part:

### Americredit Corp. Reports Record Second Quarter Operating Results

> 2nd Quarter Earnings Per Share Up 58% to $0.57
> 2nd Quarter Net Income Up 69% to $48.4 Million
> Managed Portfolio Up 55% Over December 1999
> Annualized Charge-Off Rate Declines to 3.6%

> AMERICREDIT CORP. (NYSE: ACF) today announced record net income of $48,442,000, or $0.57 per share, for its second fiscal quarter ended December 31, 2000, versus earnings of $19,609,000, or $0.25 per share for the same period a year earlier. Earnings for the second quarter of the prior year include a charge of $10,500,000 ($8,985,000, or $0.11 per share net of income tax benefits) for the closing of AmeriCredit's mortgage business. On a comparative basis, excluding the charge, earnings increased 69% and earnings per share rose 58%.

> For the six months ended December 31, 2000, AmeriCredit reported net income of $90,715,000, or $1.08 per share, versus earnings of $44,933,000, or $0.60 per share, for the six months ended December 31, 1999. Excluding the charge, earnings for the six months ended December 31, 1999 were $53,918,000, or $0.72 per share. On a comparative basis, excluding the charge, earnings increased 68% and earnings per share rose 50%.

> Automobile loan purchases were $1,380,986,000 for the second quarter of fiscal 2001, an increase of 41% over loan purchases of $980,882,000 for the second quarter of fiscal 2000. AmeriCredit's managed auto receivables totaled $8,225,509,000 at December 31, 2000, an increase of 55% since December 31, 1999. The Company had 202 branch locations in 41 states and Canada at December 31, 2000.

> Annualized net charge-offs decreased to 3.6% of average managed auto receivables for the second quarter ended December 31, 2000, compared to 4.1% for the second quarter of fiscal 2000. Managed auto receivables more than sixty days delinquent were 2.7% of total managed auto receivables at December 31, 2000, compared to 2.5% at December 31, 1999.

47.     On February 14, 2001, AmeriCredit filed with the SEC its Form 10-Q for the

quarter ended December 31, 2000. The Form 10-Q was signed by defendant Berce. In the 10-Q,

AmeriCredit repeated the financial results reported in the January 10, 2001, press release. The February 14, 2001, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.7% for the quarter.

48.     In fact, defendants knew or recklessly disregarded that the results reported in the January 10, 2001, press release and the February 14, 2001, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

49.     On April 11, 2001, AmeriCredit issued a press release titled, "AmeriCredit Corp. Announces Record Third Quarter Operating Results." This press release states that the Company's third quarter earnings were $0.70 per share compared with earnings of $0.41 per share in the third quarter of 2000. The press release includes a statement by defendant Morris and states in pertinent part:

### AmeriCredit Reports Record Third Quarter Operating Results

3rd Quarter Earnings Per Share Up 71% to $0.70
3rd Quarter Net Income Up 86% to $60.4 Million
Managed Portfolio Up 53% Over March 2000
Annualized Charge-Off Rate Remains 3.6%

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $60,430,000, or $0.70 per share, for its third fiscal quarter ended March 31, 2001, versus earnings of $32,410,000, or $0.41 per share for the same period a year earlier. On a comparative basis, earnings increased 86% and earnings per share rose 71%.

For the nine months ended March 31, 2001, AmeriCredit reported net income of $151,145,000, or $1.78 per share, versus earnings of $77,343,000, or $1.01 per share, for the nine months ended March 31, 2000. Excluding the charge for the closing of AmeriCredit's mortgage business last year, earnings for the nine months ended March 31, 2000 were $86,328,000, or $1.13 per share. On a comparative basis, excluding the charge, earnings increased 75% and earnings per share rose

20

58%.

Automobile loan purchases were $1,653,200,000 for the third quarter of fiscal 2001, an increase of 43% over loan purchases of $1,155,116,000 for the third quarter of fiscal 2000. AmeriCredit's managed auto receivables totaled $9,101,254,000 at March 31, 2001, an increase of 53% since March 31, 2000. The Company had 217 branch locations throughout the United States and Canada at March 31, 2001.

Annualized net charge-offs were 3.6% of average managed auto receivables for the third quarter, compared to 3.9% for the third quarter of fiscal 2000. Managed auto receivables more than sixty days delinquent were 2.3% of total managed auto receivables at March 31, 2001, compared to 2.1% at March 31, 2000.

50.    On May 15, 2001, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended March 31, 2001. The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the April 11, 2001, press release. The May 15, 2001, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 2.3% for the quarter.

51.    In fact, defendants knew or recklessly disregarded that the results reported in the April 11, 2001, press release and the May 15, 2001, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

52.    On August 7, 2001, AmeriCredit issued a press release titled, "AmeriCredit Reports Record Fourth Quarter and Fiscal Year End Operating Results." This press release states that the Company's fourth fiscal quarter earnings were $0.81, compared with earnings of $0.46 per share for the same period a year earlier. The press release includes a statement by defendant Morris and states in pertinent part:

21

**AmeriCredit Reports Record Fourth Quarter and Fiscal Year End Operating Results**

> 4th Quarter Earnings Per Share Up 76% to $0.81
> 4th Quarter Net Income Up 93% to $71.7 Million
> Managed Portfolio Up 53% Over June 2000 to $10.2 billion
> Annualized Charge-Off Rate Remains 3.6%

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $71,707,000, or $0.81 per share, for its fourth fiscal quarter ended June 30, 2001, versus earnings of $37,158,000, or $0.46 per share for the same period a year earlier. On a comparative basis, earnings increased 93% and earnings per share rose 76%.

For the fiscal year ended June 30, 2001, AmeriCredit reported net income of $222,852,000, or $2.60 per share, versus earnings of $114,501,000, or $1.48 per share, for the fiscal year ended June 30, 2000. Excluding the charge for the closing of AmeriCredit's mortgage business last year, earnings for the fiscal year ended June 30, 2000 were $123,486,000, or $1.59 per share. On a comparative basis, excluding the charge, earnings increased 80% and earnings per share rose 64%.

Automobile loan purchases were $1,937,713,000 for the fourth quarter of fiscal 2001, an increase of 54% over loan purchases of $1,260,110,000 for the fourth quarter of fiscal 2000. For the fiscal year ended June 30, 2001, automobile loan purchases were $6,378,652,000, 44% higher than loan purchases of $4,427,945,000 for the fiscal year ended June 30, 2000. AmeriCredit's managed auto receivables totaled $10,203,746,000 at June 30, 2001, an increase of 53% since June 30, 2000. The Company had 232 branch locations throughout the United States and Canada at June 30, 2001.

Annualized net charge-offs were 3.6% of average managed auto receivables for the fourth quarter, compared to 3.8% for the fourth quarter of fiscal 2000. Managed auto receivables more than sixty days delinquent were 2.5% of total managed auto receivables at June 30, 2001, compared to 2.3% at June 30, 2000.

53.     In fact, defendants knew or recklessly disregarded that these results were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

54.     On September 25, 2001, AmeriCredit filed with the SEC its Form 10-K for the

22

year ended June 30, 2001. The Form 10-K was signed by defendants Morris, Barrington and

Berce. In the 10-K, AmeriCredit repeated the financial results reported in the August 7, 2001,

press release. The September 25, 2001, 10-K also stated, in pertinent part:

> Payment deferrals are at times offered to customers who have encountered
> temporary financial difficulty, hindering their ability to pay as contracted. A
> deferral allows the customer to move a delinquent payment to the end of the loan,
> usually by paying a fee (calculated in a manner specified by applicable law). The
> collector reviews the customer's past payment history and statistically based
> behavioral score and assesses the customer's desire and capacity to make future
> payments. Before agreeing to a deferral, the collector also considers whether the
> deferment transaction complies with the Company's policies and guidelines.

55.     Defendants knew or recklessly disregarded that the September 25, 2001, Form

10-K was false and misleading because it fails to disclose that the Company was improperly

deferring loan delinquencies to limit customer defaults and thus avoid activation of the

delinquency triggers.

56.     On October 10, 2001, defendants disseminated a press release touting "record first

quarter" fiscal 2002 operating results. The press release states in pertinent part:

**AmeriCredit Reports Record First Quarter 2002 Operating Results**

-- 1st Quarter Earnings Per Share Up 73% to $0.88
-- 1st Quarter Net Income Up 86% to $78.7 Million
-- Quarterly Loan Originations Up 45% to $2.0 Billion
-- Managed Portfolio Up 52% to $11.3 Billion

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of
$78,737,000, or $0.88 per share, for its first fiscal quarter ended September 30,
2001, versus earnings of $42,273,000, or $0.51 per share, for the same period a
year earlier. On a comparative basis, net income increased 86% and earnings per
share rose 73%.

Automobile loan purchases were $2,035,219,000 for the first quarter of fiscal
2002, an increase of 45% over loan purchases of $1,406,753,000 for the first
quarter of fiscal 2001. AmeriCredit's managed auto receivables totaled

$11,325,476,000 at September 30, 2001, an increase of 52% since September 30, 2000. The Company had 248 branch locations throughout the United States and Canada at September 30, 2001.

Annualized net charge-offs were 3.8% of average managed auto receivables for the first quarter, compared to 3.7% for the first quarter of fiscal 2001. Managed auto receivables more than sixty days delinquent were 3.1% of total managed auto receivables at September 30, 2001, compared to 2.4% at September 30, 2000.

57.    On November 14, 2001, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended September 30, 2001. The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the October 10, 2001, press release. The November 14, 2001, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 3.1% for the quarter.

58.    In fact, defendants knew or recklessly disregarded that the results reported in the October 10, 2001, press release and the November 14, 2001, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

59.    On January 10, 2002, AmeriCredit disseminated a press release titled "AmeriCredit Reports Record Second Quarter Operating Results, Meets Earnings Expectations." The press release states in pertinent part:

**AmeriCredit Reports Record Second Quarter Operating Results, Meets Earnings Expectations**

2nd Quarter Earnings Per Share Up 60% to $0.91
2nd Quarter Net Income Up 66% to $80.6 Million
Quarterly Loan Originations Up 47% to $2.0 Billion
Managed Portfolio Up 51% to $12.4 Billion

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $80.6 million, or $0.91 per share, for its second fiscal quarter ended December 31,

24

2001, versus earnings of $48.4 million, or $0.57 per share, for the same period a year earlier. On a comparative basis, net income increased 66% and earnings per share rose 60%.

For the six months ended December 31, 2001, AmeriCredit reported net income of $159.3 million, or $1.79 per share, versus earnings of $90.7 million, or $1.08 per share, for the six months ended December 31, 2000. On a comparative basis, earnings increased 76% and earnings per share rose 66%.

Automobile loan purchases were $2.04 billion for the second quarter of fiscal 2002, an increase of 47% over loan purchases of $1.38 billion for the second quarter of fiscal 2001. AmeriCredit's managed auto receivables totaled $12.38 billion at December 31, 2001, an increase of 51% since December 31, 2000. The Company had 254 branch locations throughout the United States and Canada at December 31, 2001.

Annualized net charge-offs were 4.3% of average managed auto receivables for the second quarter of fiscal 2002 and in line with the Company's guidance. This compares to net charge-offs of 3.6% for the second quarter of fiscal 2001. Managed auto receivables more than sixty days delinquent were 3.8% of total managed auto receivables at December 31, 2001, compared to 2.7% at December 31, 2000.

60.     On February 14, 2002, AmeriCredit filed with the SEC its Form 10-Q for the quarter ended December 31, 2001. The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the January 10, 2002, press release. The February 14, 2002, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 3.8% for the quarter.

61.     In fact, defendants knew or recklessly disregarded that the results reported in the January 10, 2002, press release and the February 14, 2002, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

62.     On April 15, 2002, defendants disseminated a press release titled "AmeriCredit

25

Reports Record Third Quarter Operating Results." The press release includes a statement by

defendant Barrington and states in pertinent part:

### AmeriCredit Reports Record Third Quarter Operating Results

3rd Quarter Earnings Per Share Up 46% to $1.02
3rd Quarter Net Income Up 52% to $91.6 Million
Quarterly Loan Originations Up 47% to $2.4 Billion
Managed Portfolio Up 50% to $13.6 Billion

AMERICREDIT CORP. (NYSE:ACF - news) today announced record net income of $91.6 million, or $1.02 per share, for its third fiscal quarter ended March 31, 2002, versus earnings of $60.4 million, or $0.70 per share, for the same period a year earlier. On a comparative basis, net income increased 52% and earnings per share rose 46%.

For the nine months ended March 31, 2002, AmeriCredit reported net income of $251.0 million, or $2.81 per share, versus earnings of $151.1 million, or $1.78 per share, for the nine months ended March 31, 2001. On a comparative basis, net income increased 66% and earnings per share rose 58%.

Automobile loan purchases were $2.43 billion for the third quarter of fiscal 2002, an increase of 47% over loan purchases of $1.65 billion for the third quarter of fiscal 2001. AmeriCredit's managed auto receivables totaled $13.63 billion at March 31, 2002, an increase of 50% since March 31, 2001. The Company had 252 branch locations throughout the United States and Canada at March 31, 2002.

Annualized net charge-offs were 4.8% of average managed auto receivables for the third quarter of fiscal 2002. This compares to net charge-offs of 4.3% last quarter and 3.6% for the third quarter of fiscal 2001. Managed auto receivables more than sixty days delinquent were 3.1% of total managed auto receivables at March 31, 2002, compared to 3.8% at December 31, 2001 and 2.3% at March 31, 2001.

``The past nine months have been both challenging and very rewarding for AmeriCredit," says Michael Barrington, chief executive officer of AmeriCredit. ``We have long believed our business model has the flexibility to withstand various economic conditions while delivering industry-leading growth and profitability. Our actual performance over the past few quarters has demonstrated this to be so."

63.     On May 15, 2002, AmeriCredit filed with the SEC its Form 10-Q for the quarter

ended March 31, 2002. The Form 10-Q was signed by defendant Berce. In the 10-Q, AmeriCredit repeated the financial results reported in the April 15, 2002, press release. The May 15, 2002, 10-Q also reported that delinquent contracts as a percentage of average managed auto receivables were 3.1% for the quarter.

64.    In fact, defendants knew or recklessly disregarded that the results reported in the April 15, 2002, press release and the May 15, 2002, Form 10-Q were false and misleading because the Company's financial performance was artificially inflated by improperly deferring loan delinquencies.

65.    On August 6, 2002, defendants disseminated a press release titled "AmeriCredit Reports Record Fourth Quarter and Fiscal Year Operating Results." The press release includes a statement by defendant Barrington and states in pertinent part:

**AmeriCredit Reports Record Fourth Quarter and Fiscal Year Operating Results**

4th Quarter Earnings Per Share Up 31% to $1.06 4th Quarter Net Income Up 35% to $96.5 Million Quarterly Loan Originations Up 25% to $2.4 Billion

AMERICREDIT CORP. (NYSE:ACF) today announced record net income of $96.5 million, or $1.06 per share, for its fourth fiscal quarter ended June 30, 2002, versus earnings of $71.7 million, or $0.81 per share, for the same period a year earlier. On a comparative basis, net income increased 35% and earnings per share rose 31%.

For the fiscal year ended June 30, 2002, AmeriCredit reported net income of $347.5 million, or $3.87 per share, versus earnings of $222.9 million, or $2.60 per share, for the fiscal year ended June 30, 2001. On a comparative basis, net income increased 56% and earnings per share rose 49%.

Automobile loan purchases were $2.43 billion for the fourth quarter of fiscal 2002, an increase of 25% over loan purchases of $1.94 billion for the fourth quarter of fiscal 2001. AmeriCredit's managed auto receivables totaled $14.76 billion at June 30, 2002, an increase of 45% since June 30, 2001.

Annualized net charge-offs were 5.2% of average managed auto receivables for
the fourth quarter of fiscal 2002, consistent with previous guidance. This
compares to net charge-offs of 4.8% last quarter and 3.6% for the fourth quarter of
fiscal 2001. Managed auto receivables more than sixty days delinquent were 3.3%
of total managed auto receivables at June 30, 2002, compared to 2.5% at June 30,
2001.

"The June quarter capped another successful fiscal year at AmeriCredit," said
Michael R. Barrington, chief executive officer of AmeriCredit Corp. "Our plan for
the quarter was to moderate our growth rate and maintain our solid financial
results, and we met those goals. We grew loan volume by 25% and net income by
35%, and I couldn't be more pleased with these accomplishments."

66.     In fact, defendants knew or recklessly disregarded that these results were false and

misleading because the Company's financial performance was artificially inflated by improperly

deferring loan delinquencies.

## THE TRUTH IS REVEALED

67.     On September 16, 2002, after the markets had closed, AmeriCredit issued a press

release disclosing that the Company would raise its delinquency trigger levels and change its

method of accounting for its loan portfolio. The press release includes a statement by defendant

Barrington and states in pertinent part:

**AmeriCredit Reaches Agreement Regarding Securitization Triggers, Will
Move Future Securitizations to On-balance Sheet Financing Structure, and
Plans to Add Three Independent Directors**

FORT WORTH, Texas--(BUSINESS WIRE)--Sept. 16, 2002--AMERICREDIT
CORP. (NYSE:ACF) announced today it has reached an agreement with Financial
Security Assurance (FSA), the Company's bond insurance guarantor, to raise
delinquency trigger levels in its securitizations.

The agreement with FSA provides for an increase in delinquency triggers to a
level in excess of the Company's current forecast of pool performance for the six
monthly reporting periods from September 2002 through February 2003. This
reduces the likelihood of an increase in credit enhancement requirements due to
delinquency triggers for all of its outstanding securitizations.

28

In consideration for raising delinquency triggers, FSA will receive warrants to purchase 1,287,691 shares of common stock, which are exercisable for five years at a 20% premium above market plus a 2.5 basis point increase in insurance fees. AmeriCredit has also announced it will structure its future securitization transactions as secured financings, which do not require the recognition of a gain-on-sale.

Accordingly, auto receivables securitized in the future will remain on the Company's balance sheet. Net earnings on its receivables will be recognized over the life of the receivables as finance charge and fee income, less related funding costs and a provision for losses. The change in securitization structure will have no impact on the Company's funding procedures, business model or cash flow.

"Middle market automobile finance can be a complex business," said AmeriCredit CEO Mike Barrington, "and some of our stakeholders have told us they don't fully understand the accounting for our business due to the use of gain-on-sale. So we've made the decision to move to on-balance sheet securitizations to make it clearer for all our stakeholders to understand our business and assess our financial results over time."

Management has indicated it plans to grow its managed loan portfolio approximately 15% annually over time. Due to the change in how future securitization transactions will be structured, the Company's earnings guidance is being revised. The new projections are as follows:

| ($ millions) | 3 mos. ended 9/30/02 | 3 mos. ended 12/31/02 | 12 mos. ended 6/30/03 | 12 mos. ended 12/31/03 |
|---|---|---|---|---|
| Net income | $55 - 60 | $(5) - (10) | $80 - 90 | $160 - 170 |

"AmeriCredit's business model is not changing. What is changing is the way we structure our securitizations, and therefore how we recognize earnings in accordance with Generally Accepted Accounting Principles. This change is consistent with our practice of providing clear and complete information to all our stakeholders," Barrington said.

68.     The next day, September 17, 2002, AmeriCredit filed its Form 10-K for the fiscal year ended June 30, 2002, with the Securities and Exchange Commission. The Form 10-K disclosed that AmeriCredit will need "at least $150 million of additional external capital" and

secure other sources of financing "in order to fund its liquidity needs in fiscal 2003."

69.     Also on September 17, 2002, CSFB issued an analyst report concerning AmeriCredit titled "Sweeping Financial Changes, Crimps near Term Valuation," which downgraded AmeriCredit stock from "Outperform" to "Neutral."  The report stated, in part, that "AmeriCredit announced sweeping changes to its financial structure after the close yesterday, including a) structuring future securitizations as financings b) rasing $500 million of common equity and c) **renegotiating its delinquency triggers on its existing deals**." (Emphasis added.) That same day, Wachovia Securities published an analyst report noting that AmeriCredit's restructuring included an agreement with Financial Security Assistance, the Company's bond insurance guarantor, "to raise delinquency trigger levels in its securitizations for the six monthly reporting periods from September 2002 through February 2003."

70.     On the same day, September 17, 2002, a subsequent article published by TheStreet.com, titled "Wall Street Gapes at AmeriCredit Wreck," noted a precipitous, thirty-percent decline in AmeriCredit's stock price and stated, in part, that "**[t]he Fort Worth, Texas, lender to people with poor credit histories has been grappling with rising loan defaults over the past year.** But credit problems appear to have gotten so bad that the once fast-growing company wants to take drastic measures to shore up its liquidity...**AmeriCredit's critics argue that it increases deferments to keep delinquency numbers down artificially**, a charge the company has denied in the past." (Emphasis added.)

71.     Investor reaction to the news of AmeriCredit's liquidity and loan portfolio problems was sharply negative.  By the close of trading on September 17, 2002, AmeriCredit's stock price had plunged thirty-eight percent (38%) from the previous day's close as a result of

this news.

72.     Approximately four months later, on January 16, 2002 – one day after the end of

the Class Period – AmeriCredit issued a press release announcing the Company's financial

results, including an $0.18 loss per share, for the second fiscal quarter ended September 30,

2002.  The press release quotes defendants Barrington and Berce, and states in pertinent part:

**AmeriCredit Reports Second Quarter Operating Results**

FORT WORTH, Texas--(BUSINESS WIRE)--Jan. 16, 2003--AmeriCredit
Corp. (NYSE:ACF) today announced a net loss of $27.6 million, or $0.18 per
share, for its second fiscal quarter ended December 31, 2002, versus earnings of
$80.6 million, or $0.91 per share, for the same period a year earlier. This was the
first quarter that AmeriCredit structured its securitization transactions as secured
financings, which did not require the recognition of gain-on-sale revenue. This net
loss also included a $46.6 million pretax impairment of the interest-only
receivable from prior securitization transactions.

For the six months ended December 31, 2002, AmeriCredit reported net income
of $42.6 million, or $0.36 per share, versus earnings of $159.3 million, or $1.79
per share, for the six months ended December 31, 2001.

Automobile loan purchases were $1.89 billion for the second quarter of fiscal
2003, down 7% from loan purchases of $2.04 billion for the second quarter of
fiscal 2002. AmeriCredit's managed auto receivables totaled $16.2 billion at
December 31, 2002.

Annualized net charge-offs were 5.8% of average managed auto receivables for
the second quarter of fiscal 2003. This compares to net charge-offs of 5.3% last
quarter and 4.3% for the second quarter of fiscal 2002. Vehicles pending sale at
auction totaled 1.4% of the portfolio at December 31, 2002, up from 1.1% at
September 30, 2002. Managed auto receivables more than 60 days delinquent
were 4.1% of total managed auto receivables at December 31, 2002, compared to
3.8% at December 31, 2001.

"We're seeing continued weakness in recovery values on repossessed vehicles
and in the overall economy, causing increases in both loss severity and frequency.
Therefore, we are projecting that credit losses will rise during the first half of
2003," said AmeriCredit Chief Executive Officer Michael R. Barrington. "We
reduced both loan origination volume and operating expenses in the December

31

quarter to align loan growth with available liquidity. We are committed to maintaining this balance going forward."

                                            ***

Pursuant to Regulation FD, the Company provides its expectations regarding future business trends to the public via a press release or 8-K filing. The Company anticipates some risks and uncertainties with its guidance as it continues to align loan growth with available liquidity.

| ($ millions) | 12 mos. ending 6/30/03 | 12 mos. ending 12/31/03 |
|---|---|---|
| Net income forecast | $70 - 80 | $100 - 125 |

"AmeriCredit expects to be profitable in 2003," said AmeriCredit Chief Financial Officer Daniel E. Berce. "We are revising our guidance to take into account possible changes in the scale of our business given the continued weakness in the overall economy and our projected increase in credit losses in 2003."

73.     Investor reaction to the January 16, 2003, news of the Company's dismal financial performance and rising credit losses caused AmeriCredit's stock to plummet a shocking 54% from the previous day – January 15, 2003, the last day of the Class Period. The same day that the Company released it second quarter financial results, Bloomberg News published an article titled "AmeriCredit has $27.6 Mln 2nd-Qtr Loss; Shares Fall," noting that the Company's stock **"fell 54 percent after the provider of auto loans reported a net loss that was triple what analysts expected because more borrowers defaulted on loans"**(emphasis added). Also in the Bloomberg News article, Sean Egan, managing director of Egan-Jones Ratings Co., noted that the second quarter loss "might be the tip of the iceberg if delinquencies are going to increase. ..."

## SCIENTER ALLEGATIONS

74.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were

32

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their

receipt of information reflecting the true facts regarding AmeriCredit, their control over, and/or

receipt and/or modification of AmeriCredit's allegedly materially misleading misstatements

and/or their associations with the Company which made them privy to confidential proprietary

information concerning AmeriCredit , participated in the fraudulent scheme alleged herein.

**Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine**

75.    At all relevant times, the market for AmeriCredit's securities was an efficient

market for the following reasons, among others:

(a) AmeriCredit's stock met the requirements for listing, and was listed and

actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, AmeriCredit filed periodic public reports with the SEC

and the NYSE;

(c) AmeriCredit regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of

press releases on the national circuits of major newswire services and through

other wide-ranging public disclosures, such as communications with the financial

press and other similar reporting services; and

(d) AmeriCredit was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and

33

certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

76.     As a result of the foregoing, the market for AmeriCredit's securities promptly digested current information regarding AmeriCredit from all publicly available sources and reflected such information in AmeriCredit's stock price. Under these circumstances, all purchasers of AmeriCredit's securities during the Class Period suffered similar injury through their purchase of AmeriCredit's securities at artificially inflated prices and a presumption of reliance applies.

**COUNT I**

**BREACH OF FIDUCIARY DUTY**
**AGAINST ALL DEFENDANTS**

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     Defendants owed a fiduciary duty to the Class, as purchasers and owners of AmeriCredit stock.

79.     Defendants, by means of their making the foregoing false and misleading statements, breached their fiduciary duty to the Class.

**COUNT II**

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND RULE 10b-5 PROMULGATED THEREUNDER**
**AGAINST ALL DEFENDANTS**

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

34

81.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of AmeriCredit publicly traded securities during the Class Period.

83.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for AmeriCredit's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

84.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of AmeriCredit as specified herein.

85.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AmeriCredit's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about AmeriCredit and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of AmeriCredit securities during the Class Period.

86.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (I) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these

36

defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

87.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing AmeriCredit's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

88.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of AmeriCredit's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of AmeriCredit's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired AmeriCredit securities during the Class Period at artificially high prices and were

damaged thereby.

89.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that AmeriCredit was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their AmeriCredit securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

90.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

91.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT III

### PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

92.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

93.    The executive officers of AmeriCredit prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of AmeriCredit. AmeriCredit controlled the Individual Defendants and each of its officers, executives and all of its employees. By reason of such conduct, defendants are liable

38

pursuant to §20(a) of the 1934 Act.

94.     The Individual Defendants acted as controlling persons of AmeriCredit within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

95.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

96.     As set forth above, AmeriCredit and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of

39

the Company's securities during the Class Period.

## CLASS ACTION ALLEGATIONS

97.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of all persons who purchased AmeriCredit publicly traded

securities (the "Class") on the open market during the Class Period. Excluded from the Class are

defendants, directors and officers of AmeriCredit and their families and affiliates.

98.     The members of the Class are so numerous that joinder of all members is

impracticable. The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.

99.     There is a well-defined community of interest in the questions of law and fact

involved in this case. Questions of law and fact common to the members of the Class which

predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to

make the statements made, in light of the circumstances under which they were

made, not misleading; and

(d) Whether defendants knew or recklessly disregarded that their

statements were false and misleading.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands judgment:

1.     Determining that the instant action is a proper class action maintainable under

Rule 23 of the Federal Rules of Civil Procedure;

     2.     Awarding compensatory damages and/or rescission as appropriate against

defendants, in favor of plaintiff and all members of the Class for damages sustained as a result of

defendants' wrongdoing;

     3.     Awarding plaintiff and members of the Class the costs and  disbursements

of this suit, including reasonable attorneys', accountants' and experts' fees; and

     4.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

     Plaintiff hereby demands a trial by jury.

DATED: February 13, 2003

**EMERSON POYNTER LLP**

By _____
     John G. Emerson, Jr.
SBOT # 06602600
830 Apollo Lane
Houston, TX 77058
Telephone: (281) 488-8854
Facsimile: (281) 488-8867

Scott E. Poynter
**EMERSON POYNTER LLP**
P.O. Box 164810
Little Rock, AR 72216-4810
Telephone: (501) 907-2555
Facsimile: (501) 907-2556

**WECHSLER HARWOOD**
Robert I. Harwood
Jeffrey M. Norton
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

**Attorneys for Plaintiff**

**Of Counsel**

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile: (410) 685-1300